No. 662 July 15, 2026 439

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of S. C. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

S. C. W.,
*Respondent,*

*v.*

C. A. W.,
*Appellant.*

Columbia County Circuit
24JU02108; A189218 (Control), A189458

In the Matter of S. C. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

S. C. W.,
*Respondent,*

*v.*

T. W.,
*Appellant.*

Columbia County Circuit
24JU02108; A189218, A189458

Denise E. Keppinger, Judge.

Submitted April 22, 2026.

Shannon Storey, Chief Defender, Juvenile Appellate Section and Elena C. Stross, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant C. A. W.

George W. Kelly filed the brief for appellant T. W.

Dan Rayfield, Attorney General, Paul L. Smith, Solicitor General, and Stacy M. Chaffin, Assistant Attorney General, filed the brief for respondent Department of Human Services.

G. Aron Perez-Selsky filed the brief for respondent child.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

In this juvenile dependency case, mother and father appeal a judgment changing the permanency plan from reunification to guardianship for their daughter, S, who was 13 years old at the time of the permanency hearing. In two assignments of error, mother argues that the Oregon Department of Human Services (ODHS) did not meet its burden to prove that its efforts to reunify S were reasonable and, therefore, that the juvenile court erred in changing S's permanency plan away from reunification. In father's sole assignment of error, he argues that the juvenile court erred in changing S's plan to guardianship because, in his view, the juvenile court's reasons for doing so—S's particular circumstances and preferences—are not set out in, or fairly implied from, the jurisdictional judgment and are therefore impermissible.

We conclude that the record supports the juvenile court's determination that ODHS made reasonable efforts to reunify S with mother. We further conclude that the juvenile court did not err in changing S's permanency plan after considering her particular circumstances and preferences. We therefore affirm.

## STANDARD OF REVIEW

We decline father's request to review *de novo* because he does not explain why this is an exceptional case warranting such review. *See* ORAP 5.40(8) (providing that where we have "discretion to try the cause anew on the record and the appellant seeks to have the court exercise that discretion, the appellant shall concisely state the reasons why the court should do so," and setting forth nonexclusive considerations for doing so). We therefore "review the juvenile court's legal conclusions for errors of law, and we view the evidence in the light most favorable to the court's disposition to determine if it supports the court's legal conclusions." *Dept. of Human Services v. S. J. M.*, 364 Or 37, 40, 430 P3d 1021 (2018). We state the facts relevant to our analysis of parents' assignments of error in accordance with that standard.

## FACTUAL BACKGROUND

An evaluation of the basis for the juvenile court's decision requires us to navigate through a challenging

factual record, which we attempt to summarize to the extent necessary to understand our conclusions in this case.

Parents share six children. B and K are adults; H, S, L, and N were found to be within the juvenile court's jurisdiction in April 2024, though this appeal involves only S. However, the family has a history of ODHS intervention dating back to 2007. In April 2015 (before L and N were born), ODHS placed B, K, H, and S in non-relative foster care due to concerns regarding neglect related to parents' substance abuse. S was returned to parents in July 2016.

Leading up to this case, ODHS implemented a protection plan for the family in March 2022 to address concerns that parents were using and exposing the children to methamphetamine, as well as mother's "unpredictable and erratic behavior" and parents' failure to maintain the children in school. S had withdrawn from elementary school in October 2021 and had not returned. In July 2023, S moved in with her adult sister, K, due to the deteriorating relationship between S and mother, and S briefly returned to school that fall but did not complete even a month before again withdrawing.

In February 2024, mother stabbed father's leg with a paring knife during a domestic dispute in N's presence, leading to mother's arrest and prosecution for assault. OHDS removed H, L, and N from parents' care in March 2024 and placed them with the same non-relative resource parents who had cared for B, K, H, and S when they were removed in 2015.

At the time, S was still living with K, who agreed to complete paperwork to become S's guardian and enroll S in school. However, by April 2024, ODHS removed S from that placement, since K had not followed through and had acknowledged that she could not handle the responsibility of ensuring that S attended school. S joined her siblings in the foster care placement, which now qualified as a "fictive kin" or "kith" placement. *See* OAR 413-070-0000(31) (defining "fictive kin" synonymously with "kith" as "an individual who is not related to the child or young adult by blood, adoption or marriage but has an emotionally significant relationship

with the child or young adult that has the characteristics of a family relationship").

That same month, parents admitted ODHS's allegations that:

- Mother "has been indicted and has pending charges for assaultive criminal behavior involving [d]omestic violence involving father, which interferes with her ability to safely parent the children currently";

- "The child(ren) have been exposed to domestic violence between the parents, and [mother] needs the assistance of the agency and outside services to help her develop safe and stable domestic relationships that protect the children from exposure [to] domestic violence";

- Mother "needs the assistance of ODHS to help her develop the parenting skills necessary to better provide for the educational needs of the children";

- Mother's "residential instability interferes with her ability to safely parent the child";

- Father "has failed to provide for the educational needs of the children"; and

- Father's "substance abuse interferes with his ability to safely parent the children."

The juvenile court asserted jurisdiction on those bases.

In September 2024, mother pleaded guilty to fourth-degree assault constituting domestic violence and recklessly endangering another person, and she entered a deferred sentencing agreement on the assault charge. The terms of that agreement and of her 18-month probation required her to have no contact with father and to engage in substance abuse treatment.

By November 2024, ODHS had referred mother to a parent mentor, residential substance abuse treatment, "hands-on parenting" training through Options, and domestic violence services. ODHS also facilitated weekly visits with S and her siblings and thrice weekly video calls. The reports on mother's progress in the residential treatment program were very positive.

After mother had successfully completed residential treatment, H was returned to her care for a trial reunification and, in March 2025, the two moved into an apartment in Portland. An Options worker made weekly visits to mother's home through April 2025 to work on "organization, grocery shopping, and providing structure."

After mother completed substance abuse treatment, family visits were briefly expanded. However, S reported to the Court Appointed Special Advocate (CASA) that during visits, the role of parenting her younger siblings fell on her, and that mother "doesn't do anything with them and they don't have any rules." Further, ODHS learned that during an overnight visit with the children in April 2025, father was also present overnight and gave marijuana to H and S. When ODHS discussed the incident with S, she was "conflicted to share information" but expressed that "she wishes to not return to [mother's] care." The CASA also noted that mother had appeared "high as a kite" on at least one recent video call with the children and thereafter declined to turn on her camera for calls.

On April 16, 2025, the attorney representing all four children moved to withdraw as counsel for S, citing a conflict of interest and S's consent to the withdrawal, and he moved to appoint new counsel for S. According to the CASA, S sought a new attorney "to work with her on a different reunification plan from her siblings." Around that same time, H was again removed from mother's care due to concerns that she was abusing marijuana and engaging in a sexual relationship with an older man with a criminal history, whom mother had first invited into the home.

A review hearing set for April 2025 was reset to June and, at the hearing, the hour allotted was scarcely enough time for the testimony of the only witness for ODHS, supervisor James. She testified that mother had been engaging in services but that, as to domestic violence services, there were some concerns about "how much internal change" mother had made and about "her understanding of the concerns" that led to the children's removal. Additionally, parents had been in contact despite the no-contact order imposed as part of mother's criminal case; the children had disclosed that

father had been present during their weekend visits with mother. Accordingly, ODHS did not believe that mother had made sufficient progress to justify returning the children to her care and recommended that she continue with domestic violence services and show "cognitive changes and behavioral changes through that treatment to include following the conditions of her probation" as to no contact with father. James acknowledged that "[m]ultiple treatment providers have expressed concern around mother's cognitive functioning" and that ODHS was offering mother a psychological evaluation to "help [the agency] determine if there were other ways to approach [mother]—or other services we can put in place for [mother] to help her make sufficient changes to maintain safety for the children." However, James believed that a psychological evaluation was "not necessary as a reasonable effort."

The CASA describes S as an "incredibly mature, self-composed, courageous" person who "knows herself." S had told the CASA in March 2025 that she did not want to return to mother's care because her mom "will never change." Despite missing grades three through five and half of sixth grade, S had a 2.8 GPA in seventh grade and was engaging in tutoring at her resource family's expense. Since residing with them, S had received glasses, medical, dental, and orthodontic care, and was attending therapy.

James testified that S was "definitely having some struggles with the family dynamics, what her parents and her sister [H] are still doing," and that ODHS offered S weekly visits with mother, but S "often chooses to not attend those" because "she doesn't believe her parents will be able to meet her needs." James described S as "one of the more vocal of the children" and noted that S had told her resource parents "that she would like to stay with them and not be returned" to her parents. She had "adjusted very well into her placement," had a "strong bond" with her resource parents, and was "thriving on structure and routine."

The court observed that docket constraints required the June hearing to be continued until September 30 and inquired whether anyone objected to maintaining the plan of reunification until then. S's counsel responded that he

had no objection that day, but that S would be requesting a change of plan at the next hearing. He asserted that S had "made huge improvements" in school, thanks to her "wonderful" resource home, and concurred with ODHS's assessment that a psychological evaluation for mother would be "helpful" but was not rationally related to the jurisdictional bases and should not delay permanency for S.

Meanwhile, in August 2025, mother successfully completed domestic violence services. Her counselor identified her as a "secondary aggressor" and recommended that she continue with individual counseling and participate in parenting classes, given that she has "demonstrated ongoing challenges in being mindful of her children's needs, particularly in setting effective boundaries[.]"

That same month, ODHS attempted to move S and L from their kith placement, but both S and her resource parents did not want S to move.[1] In a letter to the juvenile court dated September 12, 2025, James stated that ODHS was "not willing to use the tools necessary to force [S] to leave the resource home," but "does not support this placement and believes [S] should join [L]" in a new placement. James further stated that ODHS had "not changed its position on moving [S]" but was "just unable to effectuate that move due to the resistance of the resource parent."

S's therapist wrote a letter to the juvenile court ten days later to provide "a professional statement regarding [S's] mental health and information she has consented to be shared relative to her foster placement." The therapist explained that, for five months, S had been receiving services to address depression and anxiety symptoms, including suicidal ideation, low self-esteem, hopelessness, discomfort at school, and difficulty focusing; that S reported that her symptoms had reduced and felt more manageable; that the therapist received a crisis call to support S on the day

---

[1] The resource parents, who were parenting two children of their own, both under six years old, were "burned out" and had previously requested that ODHS move both H and N due to difficult behavior. H had been temporarily reunited with mother before being again removed and placed in another non-relative foster home, and N had been moved to a different non-relative foster home in June 2025. The resource parents had also requested L to be moved before the beginning of the school year.

she was anticipating removal from her current placement in which S reported "feeling numb, very sad, and panicked"; that S shared that she felt very close with her current resource family, and she described their home as a "place to grow"; that S consistently expressed that she valued staying connected with her siblings but did not necessarily wish to be placed with them; and that S expressed feeling like "no one was listening to her" and that what she wanted "was being treated like it isn't important."

The day before the September hearing, ODHS moved for a continuance because the family report was incomplete. The juvenile court continued the hearing to give the parties time to review the report. The court heard evidence and argument on two additional days in October.

The family's caseworker, Gutierrez, testified that over the life of the case, the agency had offered mother "recovery support services, DV [domestic violence] survivor resources, mental health resources," and had "[f]acilitated family decision meetings and had been communicating regularly to support resources that could support" mother. Gutierrez acknowledged that ODHS had not yet followed up on the recommendations from mother's DV counselor or referred mother for a psychological evaluation. In Gutierrez's opinion, mother had "demonstrated minimal change in her perceptions of what happened leading to the children's removal" and "struggles between separating herself from her partner who currently has a no contact order, and becoming self-sufficient on her own for her children." However, Gutierrez believed that "continued monitoring of [mother's] drug use, *** more domestic violence services, groups, *** consistent mental health counseling, [and] parent-related resources" for mother would make it likely that the children could return home in a reasonable period of time.

Regarding S, Gutierrez testified that mother has ongoing weekly visits scheduled with S and that a family time coordinator regularly communicates with S's resource parent and S about attending, but "[t]hey're declining visits." ODHS had not referred mother and S to family counseling "based on conversations with [S] about her readiness to

engage," though they had not directly asked S if she would participate in some type of family counseling. S has developed a strong bond with her resource family and expressed that she feels supported, connected, and understood in the home and her community, and that she views her placement as a positive environment where she is able to grow, maintain friendships, and develop her independence.

ODHS contended that it had made reasonable efforts to reunify the family but that neither parent had made sufficient progress. The agency asserted that father "has not made measurable progress toward addressing his substance use or domestic violence concerns and has limited engagement with ODHS or services." Nonetheless, ODHS requested that the current plan of reunification remain in place, explaining that while mother "has demonstrated meaningful engagement in services *** she continues to struggle with consistency and maintaining safe boundaries" and that "additional time and services are needed" to achieve reunification. In ODHS's view, "the agency would like to get the siblings together at all costs," and had been attempting to do so but only recently had identified a possible placement for all four children.

Mother, father, H, L, and N all agreed that the plan should remain reunification.

However, S's counsel reiterated that "while she loves her parents, she is *** ready to start the process of doing a guardianship with her current caretakers." ODHS responded that it did not support a plan of guardianship with S's current resource parents and questioned whether the court had authority to order ODHS to move forward with those resource parents as guardians or to compel the agency to file a motion to that end. S remonstrated that the juvenile court has discretion under ORS 419B.349 "to order that [S] be maintained at her current caretaker [kith] home" and to change S's plan upon finding that ODHS had made reasonable efforts to reunify parents with S. S argued that the specifics of finalizing a guardianship were not yet before the court. ODHS conceded the latter point and, when the court sought its position on an order to maintain S in her current placement, ODHS stipulated that it would not

remove S from her resource family "without coming to the Court or agreement of all parties."

The juvenile court determined that ODHS had made reasonable efforts to reunify the family and that neither parent had made sufficient progress. As to H, L, and N, the court maintained the plan of reunification "based on all the parties' uncontested desire to keep this moving forward" and "the identified potential services for mom that could help her to become a safe placement within a reasonable period of time."

For S, the juvenile court ordered a change of plan to guardianship. It found that S had been in substitute care for more than 531 days, that she had not lived with parents for "a significant amount of time" prior to removal, that she is bonded to her resource parents, and that she has consistently expressed her own desire for permanency in her current placement, where she is thriving. The court found that "ODHS did not really clearly articulate their basis to continue reunification specifically to [S]," given that she has not recently moved placements like her siblings and given that ODHS had "no really identifiable plan to place the siblings together." The court also determined that adoption was not appropriate because S has "demonstrated ***strong bonds with her siblings" and a bond with her parents, albeit a "strained" one, such that "guardianship would allow for that ongoing relationship to *** move forward."

Parents timely appealed the permanency judgment changing S's plan to guardianship.

## ANALYSIS

A juvenile court has authority to change a child's permanency plan away from reunification upon determining that ODHS has "made reasonable efforts *** to make it possible for the ward to safely return home" and that the parent has not "made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a). "In making its determination, the court shall consider the ward's health and safety the paramount concerns." *Id.* "Efforts are reasonable when the agency has taken appropriate steps under the circumstances to give parents a full

and fair opportunity to remediate the bases for jurisdiction to become at least minimally adequate parents (and, for purposes of a permanency hearing, to show that they have made sufficient progress to make it possible for the child to safely return to their care)." *Dept. of Human Services v. C. H.*, 373 Or 26, 50, 559 P3d 395 (2024). "[A]ssessing the reasonableness of [O]DHS's efforts to assist parents in that endeavor is most fairly accomplished by inquiring into [O] DHS's efforts over the course of the agency's involvement with the family." *Id.* at 51.

"[B]oth [ODHS's] efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction." *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012). That means that the court may rely only on facts that are "explicitly stated or fairly implied by the jurisdictional judgment" in making its determinations regarding ODHS's reunification efforts and the parent's progress. *Id.* at 715-16. "Facts are not 'fairly implied' by a jurisdictional judgment, and thus are 'extrinsic' to the jurisdictional judgment, if a reasonable parent would not have known from the jurisdictional judgment that [they] needed to address the condition or circumstance exemplified by those facts." *Dept. of Human Services v. T. L.*, 287 Or App 753, 763, 403 P3d 488 (2017).

In mother's first assignment of error, she argues that the juvenile court erred in determining that ODHS's efforts to reunify mother with S qualified as reasonable. Mother contends that ODHS knew by March 2025 that mother "suffered from some cognitive difficulties" but did not adjust its efforts by following through with the psychological evaluation or the DV counselor's recommendations. Mother further contends that ODHS failed to offer mother assistance to develop skills to address S's particular educational and mental health needs and never attempted to repair mother's relationship with S so that it would be safe for S to return to her care.

ODHS takes no position on appeal, except with regard to the correct legal standards to be applied to parents' claims of error.

S argues that because jurisdiction was not based on mother's mental health or impaired cognitive functioning, it is not clear how ODHS would have "the authority, let alone the burden," to require mother to participate in a psychological evaluation and that ODHS is not obligated to offer and provide every conceivable reunification service. Further, S contends that, at age 13, she was old enough to advocate for herself and determine how much contact and visitation she wanted with her parents and that, in any event, it is unclear how ODHS could have compelled or persuaded her to engage in services with mother.

We conclude that the juvenile court did not err in determining that ODHS made reasonable efforts to reunify mother with S. ODHS provided mother with services to address each of the admitted jurisdictional bases: substance abuse treatment to comply with her criminal probation, domestic violence services, "hands-on parenting" training, a parent mentor, and housing assistance. *See Dept. of Human Services v. K. S. S.*, 310 Or App 498, 504, 485 P3d 924 (2021) (explaining that "the specific issues of parental unfitness established in the jurisdictional judgment provide the framework for the court's analysis of each question—that is, both [O]DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction" (internal quotation marks omitted)).

Although we agree with mother that referring her for a psychological evaluation and following up with her DV counselor's recommendations would certainly benefit her, we cannot say that ODHS's failure—thus far—to do so renders its efforts unreasonable in the totality of the circumstances over the life of the case. Mother's mental health was not a jurisdictional basis. By all accounts, mother had been complying with the case plan and engaging in services, and she achieved trial reunification with H and expanded family visits before she began to struggle upon moving into her own apartment. Even after H was again removed and visits restricted, mother successfully completed domestic violence services in August 2025. As for the recommendations for additional services, mother's DV counselor provided those only two months before the permanency hearing concluded.

Finally, we disagree with mother's contention that ODHS did not sufficiently tailor its efforts to reunify her with S, specifically with regard to S's particular educational needs. S's educational needs, as with her siblings, are simply to be enrolled in and regularly attending school. ODHS implemented a family protection plan to address parents' failure to maintain the children in school two years before it sought jurisdiction, and the agency worked with the family to get S enrolled in and attending school before removing her from parents' care. Further, ODHS provided mother with weekly assistance from November 2024 to April 2025 to develop "hands-on parenting" skills, such as providing organization and structure in her home. We also reject mother's contention that ODHS failed to tailor its efforts to S's particular mental health needs and never attempted to repair mother's relationship with S. To the extent S has particular mental health needs, her symptoms arise in periods of uncertainty and instability and are best supported through structure, routine, and stability that mother has not yet demonstrated an ability to provide. S's relationship with mother had suffered well before S was placed in substitute care and continues to suffer due to S's understandable perception that mother is not ameliorating the jurisdictional bases.

We turn to mother's second and father's single assignment of error, both of which challenge the juvenile court's ruling changing S's plan from reunification to guardianship. We reject mother's second assignment without further discussion because she argues only that the juvenile court's predicate legal determination that ODHS made reasonable efforts was erroneous, a contention that we have already rejected.

Father argues that the juvenile court's ruling changing S's plan erroneously relied on S's particular circumstances and preferences, which, in father's view, are not part of the jurisdictional judgment and therefore "are not things upon which a change in the permanency plan may be based." Father also contends that the juvenile court's finding, "at least with regard to mother, that additional services would make it likely that [H, L, and N] could be returned home in a reasonable amount of time" is inconsistent with

its finding that "it's really hard to calculate that there's a reasonable amount of time that this will all turn around and [S] can be reunified with mother."

S responds that the juvenile court correctly identified the jurisdictional allegations and made permanency findings based on the record before it, which included S's unique permanency needs and satisfaction with her kith placement. S points out that the court's determinations with regard to her siblings were uncontested and that the court expressly found that ODHS's reasons for not seeking a plan change for S's siblings—because they each had recently moved placements, and the agency wanted more time to place them together—did not apply to S.

ODHS contends that the juvenile court may consider a child's preferences regarding their permanency plan. It points to federal law, which requires the court to "consult[ ], in an age-appropriate manner, with the child regarding the proposed permanency or transition plan for the child[.]" 42 USC § 675(5)(C)(iii). ODHS also observes that because S had been in substitute care for more than 17 months at the conclusion of the permanency hearing, ODHS is required to file a petition to terminate parental rights, ORS 419B.498(1)(a) and (2), unless "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward," ORS 419B.498(2)(b), including that "[a]nother permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships," ORS 419B.498(2)(b)(B). And because "ORS 419B.476(5) and ORS 419B.498(2) call for a 'child-centered' determination based on a current evaluation of the child's circumstances," *Dept. of Human Services v. S. S.*, 283 Or App 136, 142, 388 P3d 1178 (2016), the juvenile court "was required to consider [S']s particular circumstances when determining whether a compelling reason existed to forgo changing her permanency plan to adoption."

The juvenile court did not err. As we understand its ruling, the court did not rely on extrinsic facts in making its determinations that ODHS made reasonable efforts to

reunify the family and that parents failed to make sufficient progress under ORS 419B.476(2)(a). The court expressly found that ODHS offered father a number of services to address his two jurisdictional bases and that, aside from supervised parenting time, father had not actively engaged in any of them. As to mother, the court found that she had participated in offered services but "has not demonstrated enough change to allow the children to be returned safely home," particularly in her perception of the circumstances leading up to the children's removal and her "continued struggle to separate herself from her partner" despite the existence of the no-contact order. Thus, the juvenile court's reasonable efforts and sufficient progress determinations were not based on facts extrinsic to the jurisdictional judgment.

In seeking a different result, father argues that this case is controlled by *T. L.* We disagree. In that case, the father had undisputedly ameliorated the sole jurisdictional basis—his substance abuse—and the juvenile court nonetheless concluded that he had not made sufficient progress for his daughter to safely return home because his daughter was alienated from him, did not want to be reunified with him, and would regress to unsafe behaviors if reunification was pursued. 287 Or App at 765. We held that a juvenile court cannot base its permanency determinations on the "consequences" of a jurisdictional basis if that condition "no longer persists and the consequences themselves are not expressly stated in, and cannot be fairly implied from, the jurisdictional judgment." *Id.* at 766. Here, by contrast, father does not challenge the juvenile court's determination that he has not ameliorated the jurisdictional bases, and sufficient evidence supports the juvenile court's determination that the conditions underlying the jurisdictional bases continue to exist.

We next address father's argument that the court's findings regarding further efforts were inconsistent. We agree that the court exercised its discretion to determine that further efforts will make it possible for H, L, and N to return home within a reasonable period of time. ORS 419B.276(4)(c). And it did so expressly because all involved

parties stipulated to maintaining the plan of reunification as to H, L, and N.

But we disagree that the juvenile court affirmatively made that determination with regard to S, and it was not required to do so. *See Dept. of Human Services v. C. K.*, 351 Or App 13, 16-19, ___ P3d ___ (2026) (clarifying that a juvenile court has discretion whether or not to determine if further efforts will make it possible for the ward to return home within a reasonable time and, if it does so, that determination is reviewed for legal error). Rather, as we understand the juvenile court's ruling, its reliance on S's particular circumstances and preferences related to its determinations under ORS 419B.476(5)(e) "that the permanency plan for [S] should be establishment of a legal guardianship" and, concomitantly, "why neither placement with parents nor adoption is appropriate." As noted, those determinations are "child-centered." *S. S.*, 283 Or App at 143. Thus, the juvenile court correctly considered S's particular circumstances and preferences in making those determinations, and there is ample evidence in the record to support them as a result of S's persistent efforts to advocate for herself. We therefore reject father's assignment of error.

Affirmed.